UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| HOT STUFF FOODS, LLC, | ) | CIV. 11-4055-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING PLAINTIFF'S |
| vs. | ) | MOTION FOR PARTIAL SUMMARY |
| | ) | JUDGMENT AND DENYING |
| HOUSTON CASUALTY COMPANY, | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Defendant. | ) | |

Plaintiff, Hot Stuff Foods, LLC (Hot Stuff), brought this cause of action against its insurer, Houston Casualty Company (HCC), seeking a declaratory judgment that it is entitled to indemnity and coverage under its accidental product contamination insurance policy and alleging breach of contract. Docket 1. Hot Stuff moves for partial summary judgment on the liability issue. Docket 22. HCC resists that motion. Docket 34. HCC moves for summary judgment and claims that because the accidental product contamination definition in the contract was not met, coverage under the policy was not triggered, and Hot Stuff is not entitled to indemnification. Docket 26. Hot Stuff resists that motion. Docket 32. For the following reasons, Hot Stuff's motion for partial summary judgment is granted, and HCC's motion is denied.

## BACKGROUND

The material facts in this case are undisputed.[1] Hot Stuff Foods is a company that manufactures food and is headquartered in Sioux Falls, South Dakota. HCC is an insurance company that insured Hot Stuff against losses incurred through product tampering or product contamination. Hot Stuff distributes sausage and other parts of its sausage breakfast sandwich from a processing facility in Sioux Falls. From another Hot Stuff facility in Shakopee, Minnesota, Hot Stuff distributes a sausage breakfast sandwich that is fully assembled. The sausage that comes from the Sioux Falls facility contains MSG, while the sausage from the Shakopee facility does not contain MSG.

From August of 2010 through early January of 2011, sausage containing MSG was sent from the Sioux Falls facility to the Shakopee facility and incorrectly labeled as being a product that did not list or declare MSG as an ingredient. Hot Stuff discovered this error on January 7, 2011. Each mislabeled sandwich contained between 0.0638 and 0.1276 grams of MSG. On January 11, 2011, Hot Stuff initiated a voluntary recall of 193,507 cases of mislabeled breakfast sandwiches. The recall occurred after Hot Stuff notified the Food and Drug Administration (FDA) and the Food Safety and Inspection Service of the United States Department of Agriculture (FSIS) of the mislabel or

---

[1] Hot Stuff and HCC stipulated that for purposes of the parties' cross-motions for summary judgment that "there is no genuine issue" of material facts. Docket 28 at 1.

contamination incident. Both agencies recommended that Hot Stuff initiate the voluntary recall. Hot Stuff's recall was classified as a Class III recall, or one "where the use of the product will not cause adverse health consequences." Docket 28 ¶ 21.

Hot Stuff notified HCC that it failed to list MSG as an ingredient on its label and that a recall had begun. Hot Stuff made a claim for coverage under its policy. The policy at issue in this case is called "Malicious Product Tampering/Accidental Product Contamination Insurance." Docket 28-1. Hot Stuff was insured by HCC for the policy period from October 1, 2010, through October 1, 2011. Docket 28-1 at 1. After Hot Stuff submitted its claim under the policy, HCC conducted an investigation and denied the claim by letter. Docket 14 at 9. In the denial letter HCC stated that "it appears that the above claim has not and will not result in physical symptoms of bodily injury, sickness or disease or physical damage to tangible property other than Hot Stuff's products and does not fall within the Accidental Product Contamination definition contained in the Policy." Docket 14 at 9.

The specific language at issue within the policy is the definition of what constitutes an Accidental Product Contamination and triggers coverage. The contract provides that the definition of "Accidental Product Contamination" is:

(1) any accidental or unintentional contamination, impairment or mislabeling (including mislabeling of instructions for use) during the manufacture, blending, mixing, compounding, packaging, labeling,

3

preparation, production or processing (or storage on the premises of the Named Insured), of the Named Insured's PRODUCTS (including their ingredients or components), or PUBLICITY implying such, or

(2)   fault in design specification or performance of the Named Insured's PRODUCT(S)

provided always that the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or *may likely result*, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock — other than PRODUCT(S) of the Named Insured.

Docket 28-1 at 6 (emphasis added).

The contaminant at issue in this case is monosodium glutamate (MSG) and its effect on those who ingest it. "Glutamate is a salt form of amino acid," and MSG "is the single sodium salt of glutamate[.]" *Truth in Labeling Campaign v. Shalala*, 999 F. Supp. 1289, 1291 (E.D. Mo. 1998) (citations omitted); *see also* Docket 30-1 at 3 (stating that MSG "is the sodium salt of glutamic acid, one of the most common occurring non-essential amino acids."). MSG exists either in a bound form or a free form. *See* Docket 24-2 at 2. The bound form of MSG is usually found naturally in foods, and the free form is added as a flavor enhancer. Docket 24-2 at 2. As a flavor enhancer, MSG is "commonly added to Chinese food, canned vegetables, soups and processed meats."[2] MSG is

---

[2] Zeratsky, Katherine, *What Is MSG? Is It Bad for You?*, Mayo Clinic, http://www.mayoclinic.com/health/monosodium-glutamate/AN01251 (last visited July 5, 2012).

considered to be one of the most or "the most widely used flavor enhancer[,]" and "like salt, brings out or enhances flavor." *Shalala*, 999 F. Supp. at 1292. "Free glutamate is readily available for use in the body, whereas bound glutamate becomes available to body tissues more slowly, as the intestines chemically break down foodstuffs." *Id.*

The FDA first considered MSG to be classified as an artificial flavorer and mandated that it be declared in that manner on an ingredient list. *Id.* As MSG's use and availability increased, however, the FDA altered its policy to require that MSG be listed on the label by its common name, monosodium glutamate. *Id.* The FDA has generally recognized that MSG is safe for use, but its use remains controversial, which is why the FDA requires that it be listed on ingredient labels. The FDA has received numerous reports of adverse reactions to foods that contain MSG, and the reactions are known as MSG symptom complex. *See Shalala*, 999 F. Supp. at 1292 ("Consumer complaints about adverse reactions to MSG led to evaluation of the use of MSG as a flavor enhancer and of the possibility that such use could adversely impact the structure or function of the nervous system.").

Hot Stuff initially estimated that 193,507 cases of sausage breakfast sandwiches may have been improperly labeled. That number eventually shrank as Hot Stuff reported that it does not "foresee the total cases accounted for being even close to the total cases initially identified . . . [because] distributors tend to have less than 30 days on hand and most retailers prefer to not have

more than 7 days on hand." Docket 27 at 7. Both parties acknowledge that there have been no reports of actual physical symptoms of sickness, bodily injury, disease, or death from any person who consumed the incorrectly labeled breakfast sandwiches. Docket 28 ¶ 23. Hot Stuff estimates that its losses from the incident were in excess of $675,000. Docket 1 ¶ 21.

Following HCC's denial of Hot Stuff's claim under the policy, Hot Stuff brought this claim on April 22, 2011. Docket 1. In its complaint, Hot Stuff asked that the court declare that Hot Stuff's losses from the contamination incident are covered under the terms of the policy. Docket 1 at 6. Hot Stuff also alleges that HCC materially breached its contract or policy with Hot Stuff when it denied coverage and refused to pay for any of Hot Stuff's losses stemming from the contamination incident. Docket 1 at 6. On February 24, 2012, Hot Stuff moved for partial summary judgment and requested the court to interpret the language of the contract. Docket 22. On that same day, HCC filed a cross-motion for summary judgment and also asked the court to interpret the terms of the contract. Docket 26.

## STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*

6

*Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." (internal quotations omitted)). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows that there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

Once the moving party has met its initial burden, the nonmoving party must establish "that a fact . . . is genuinely disputed" either "by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). For purposes of summary judgment, the facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995) (citation omitted). For resolution of contract

terms, summary judgment may be granted if the "documents supporting the Rule 56 motion are undisputed and reveal that there is no question as to intent." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2730.1 at 61 (3d ed. 1998). Construction of a contract is a question of law that may be determined in a motion for summary judgment. *Id.* at 61-63. Thus, when the meaning of the contract is clear, "the construction of certain provisions in an insurance policy that does not require an inquiry into the parties' intentions or the consideration of outside and conflicting evidence properly may be resolved by summary judgment." *Id.* at 90.

     Both parties relied on South Dakota law and Eighth Circuit Court of Appeals precedent in their briefs in support of their motions for summary judgment. Minnesota and South Dakota are the two states that have contacts with this claim. The court need not decide which state's law applies because the court finds, assuming without deciding, that Minnesota and South Dakota[3] contract interpretation law is substantially similar, and the result would be the same under either state's law. *See Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007) ("Before applying the forum state's choice-of-law rules, however, a trial court must first determine whether a conflict exists."); *see also Phillips v. Marist Soc. of Wash. Province*, 80 F.3d 274, 276 (8th Cir.

---

[3] The court also finds that under South Dakota's "most significant relationship" test for the choice-of-law inquiry, the court is directed to apply South Dakota law because it is the state with the most significant relationship.

1996) (" '[B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' ") (citation omitted). The parties do not dispute that South Dakota substantive law applies to this contract interpretation cause of action, so the court will apply South Dakota law.

## DISCUSSION

### A.    Contract Interpretation

The main issue in dispute is how the definition of the "accidental product contamination" should be interpreted. The parties disagree as to the meaning of the following policy language: "the Named Insured's CONTAMINATED PRODUCT(S) has . . . either resulted, or *may likely* result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s)[.]" Docket 28-1 at 6 (emphasis added). Hot Stuff argues that the improper labeling of its product and purchasers' subsequent exposure to MSG had a possibility to cause physical symptoms of bodily injury or sickness to any person. HCC contends that the probability of harm to consumers exposed to the MSG in the breakfast sandwich was so remote that the contractual definition of accidental product contamination was not satisfied.

"State law governs the interpretation of insurance policies." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003) (citing *Capitol Indem. Corp. v. Haverfield*, 218 F.3d 872, 875 (8th Cir.

2000)). The interpretation of the insurance policy is subject to the rules that govern the interpretation of contracts in South Dakota.

Contract construction is a question of law that is determined by the court. *LaMore Rest. Grp., LLC v. Akers*, 748 N.W.2d 756, 761 (S.D. 2008). To understand the meaning of the contract, the court will give effect "to the plain meaning of its words." *In re Dissolution of Midnight Star Enters., L.P.*, 724 N.W.2d 334, 337 (S.D. 2006) (citations omitted). The court will also "give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation." *Id.* (citations and internal quotations omitted). " 'This court must construe all provisions of the policy together and ascertain the intention of the parties, if possible.' " *Nat'l Farmers Union Prop. & Cas. Co. v. Farm & City Ins. Co.*, 689 N.W.2d 619, 622 (S.D. 2004) (quoting *Helmbolt v. LeMars Mut. Ins. Co.*, 404 N.W.2d 55, 59 (S.D. 1987)).

The South Dakota Supreme Court has stated:

> [w]here the provisions of an insurance policy are fairly susceptible of different interpretations, the interpretation most favorable to the insured should be adopted. This rule of liberal construction in favor of the insured and strictly against the insurer applies only where the language of the insurance contract is ambiguous and susceptible of more than one interpretation[.]

*Lakes' Byron Store, Inc. v. Auto-Owners Ins. Co.*, 589 N.W.2d 608, 609 (S.D. 1999) (citations omitted). When an insurance contract is susceptible to two different interpretations then " 'the interpretation most favorable to the insured should be adopted.' " *Opperman v. Heritage Mut. Ins. Co.*, 566 N.W.2d 487, 489

(S.D. 1997) (internal quotations and citations omitted). "Insurance contracts warrant reasonable interpretation, in the context of the risks insured, without stretching terminology." *Id.* at 490 (citations omitted). "Under the canon of *noscitur a sociis*, words take import from each other." *Id* (citation omitted). "This maxim of interpretation is 'wisely applied where a word [or phrase] is capable of many meanings in order to avoid the giving of unintended breadth' to contract provisions." *Id.* (citations omitted).

"We do not give contracts such broad interpretations as to produce an absurd result." *Lillibridge v. Meade Sch. Dist. # 46-1*, 746 N.W.2d 428, 433 (S.D. 2008) (citing *Kling v. Stern*, 733 N.W.2d 615, 618 n.3 (S.D. 2007)). An absurd result is "ridiculously incongruous or unreasonable," and because parties are presumed to be rational people who pursue rational ends, they would not agree upon an absurd result. *Nelson v. Schellpfeffer*, 656 N.W.2d 740, 743 (S.D. 2003). "When an insurer seeks to invoke a policy exclusion as a means of avoiding coverage, the insurer has the burden of proving that the exclusion applies." *Am. Fam. Mut. Ins. Co. v. Purdy*, 483 N.W.2d 197, 199 (S.D. 1992) (citing *Western Cas & Sur. Co. v. Anderson*, 273 N.W.2d 203, 205 (S.D. 1979)).

The parties do not dispute that the sausage breakfast sandwiches did contain MSG, thus, they were not properly labeled and satisfy the "mislabeled" portion within the definition of accidental product contamination. The dispute then is whether MSG is a contaminant such that the consumption of which

11

"*may likely result,* in (1) physical symptoms of bodily injury, sickness or disease or death of any person(s)." Docket 28-1 at 6. The precise inquiry is then whether "may likely" means a possibility of illness or a probability that the product would cause illness. The court takes this plain reading of this definition as a whole to mean that if any person *could* experience physical symptoms of bodily injury, sickness or disease as a result of his or her exposure to the MSG-containing sausage, then coverage is triggered under the policy.

### 1.   Plain Meaning

The definition of the word "may" is to "be in some degree likely to." Webster's Third New International Dictionary 1396 (3d. 1981). *See also* Black's Law Dictionary 1000 (8th ed. 2004) ("To be a possibility."). The definition of the word "likely" is "of such a nature or so circumstanced as to make it something probable" or "in all probability: probably." Webster's Third New International Dictionary 1310 (3d. 1981). The word "may" suggests that something is possible and "likely" suggests that something is probable. When read in conjunction these two words essentially balance each other out and leave the impression that "may likely" means that there is a chance that an illness or sickness will result.

Although the court has interpreted the terms at issue in the contract, it now must decide whether "any person" who ingests the amount of MSG within

12

Hot Stuff's breakfast sandwich has a chance that physical symptoms of illness or sickness will occur such that the terms of the policy are triggered.

The parties argue about the potential harm that MSG can have on people in general, as well as sensitive subsets within the general population. Hot Stuff relies on a number of common MSG studies and the opinion of its expert, Dr. Henry Fishman,[4] who is a board certified allergist/immunologist who relies mainly on his academic career, private practice clinical career, and experience

---

[4] Defendant objected to Dr. Fishman's initial expert report as well as his supplemental report. Docket 40. Defendant states that Dr. Fishman's initial report is improper and does not comport with Federal Rules of Evidence 702 and 703 because his opinion is not based on sufficient or reliable facts or data, it is not the product of reliable principles and methods, and it does not reliably apply the principles and methods to the facts of the case. Docket 40 at 2. Defendants also argue that Dr. Fishman's supplemental report is improper because it was untimely and violates Federal Rules of Civil Procedure 26(a)(2)(D) and 37(c)(1). Docket 40 at 1-2. Hot Stuff denies that either report is improper and states that because HCC merely objected, but did not move to strike the reports or file a *Daubert* motion, the court does not have to take action on the objection. Docket 42. The court agrees. Because HCC did not move to strike the reports or file a *Daubert* motion, the court will consider Dr. Fishman's reports in its summary judgment determination. Regardless, the court also finds that Dr. Fishman's opinion meets the basic *Daubert* requirement in that it is scientific, reliable, and relevant for assisting the trier of fact to understand a fact in issue or the evidence in question. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993). Additionally, both Hot Stuff's and HCC's experts were retained to review pertinent medical studies and reports on the effect of MSG on individuals, and each expert gave his expert opinion based on his knowledge and experience and the literature he reviewed. Both experts have served their purpose, but any determination on credibility or weighing of their testimony is not properly before the court. *See Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (" 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.' ") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

as a medical journalist to give his opinion. Docket 24-4 at 1. HCC relies on the expert opinion of Dr. Andrew Saxon, a licensed physician who specializes in the areas of immunology and allergy. Docket 30-1 at 1.

Dr. Fishman states that he has come to the conclusion that MSG may likely cause health problems based on his own personal experience and practice, as well as his review of numerous studies and independent research. Docket 24-4 at 1-2. "It is my expert opinion that MSG, a flavor enhancer used by millions, may likely result in a spectrum of difficulties in sensitive patients, characterized as the 'Chinese restaurant syndrome.' " Docket 24-4 at 1.

Dr. Fishman also discusses a seminal study of MSG's effects on humans that is known as the 1995 FDA/FASEB report and states that his conclusions do not contradict this report. Following the FDA/FASEB report, the FDA concluded that MSG or compounds like glutamate are generally safe when eaten by most people at regular amounts and that MSG does not cause neurological problems. Docket 24-4 at 1-2. Dr. Fishman notes that the FDA/FASEB study did not conclude, however, that MSG never causes health problems and that there were two groups identified as high risk. Docket 24-4 at 2. That study found that asthmatics and a group of particularly sensitive individuals could have a reaction to MSG when exposed to the additive in an amount of 3 grams or more. Docket 24-4 at 2. Dr. Fishman agreed with the results of the study and found that based on the FDA/FASEB study and

14

another rhinitis study that the amount of MSG that would exist in three to five sausage patties could cause health problems. Docket 24-4 at 2.

In conclusion, Dr. Fishman acknowledges that he agrees "with the FDA/FASEB reports [sic] basic conclusion that MSG is generally safe for most people, and support its labeling recommendations, based on my experience, problems with the FDA's reports, data within the report, and other lines of evidence, I believe that MSG may likely result in health problems and that, indeed, a small percentage of the population is genuinely sensitive to it." Docket 24-4 at 2.

Dr. Saxon also has substantial education and experience relevant to MSG and its effects. In particular, he took part in a study as to whether MSG induced a profile of symptoms of what is commonly known as "Chinese Restaurant Syndrome." Docket 30-1 at 3. In his report, Dr. Saxon makes a number of conclusions about MSG. His main conclusions are that MSG is not toxic, it is not an allergen, and MSG more than likely would not negatively affect even the most sensitive person when found in doses like what exist in Hot Stuff's sandwiches. Docket 30-1 at 4-7.

First, Dr. Saxon explains that although almost any substance can have a toxic effect in large doses, because "MSG is so common and well tolerated that the Allowable Daily[5] Intake" is not specified, a toxic dose would be in the

---

[5] The maximum intake of MSG currently regarded as safe is 6 grams/kg. Docket 30-1 at 4.

multiple grams/kg range. Docket 30-1 at 4. Because the breakfast sandwiches only contain up to 127.6 mg of MSG, Dr. Saxon opines that even if a person consumed eight of those sandwiches the dose of 1000 mg would still be trivial or inconsequential. Second, Dr. Saxon also states that the body does not have immunological or allergic reactivity to MSG, and thus, can cause no adverse health effects from exposure to it. Docket 30-1 at 4-5.

Finally, Dr. Saxon also believes that MSG does not cause idiosyncratic adverse health effects or "reactions that are generally unpredictable and are effects that occur in rare individuals." Docket 30-1 at 5. The most common effects that have been associated with MSG are: (1) asthma, (2) "Chinese Restaurant Syndrome," (3) headache, and (4) urticaria[6] or angioedema.[7] Docket 30-1 at 5. Dr. Saxon concludes that there is no conclusive proof in any of the studies that any of those four common effects are the result of exposure to MSG, or if there is some proof, then the dose of MSG is considerably higher than what is at issue in this case.

---

[6] "An eruption of itching wheals, colloquially called hives, usually of systemic origin; it may be due to a state of hypersensitivity to foods or drugs, foci of infection, physical agents (heat, cold, light, friction), or psychic stimuli." Stedman's Medical Dictionary 2077 (28th ed. 2006).

[7] "Recurrent large circumscribed areas of subcutaneous or mucosal edema of sudden onset, usually disappearing within 24 hours; frequently, an allergic reaction to foods or drugs." Stedman's Medical Dictionary 86 (28th ed. 2006).

Dr. Saxon did acknowledge, however, that "while there is some minimal evidence that MSG might cause urticaria in very rare subjects, on balance this data does not reach the level of it is more than likely than not that it does."[8] This admission, coupled with the support of Dr. Fishman's opinion, suggests that there is a chance that a person who is exposed to MSG could suffer from physical symptoms of a sickness or illness, namely, urticaria (hives) or angioedema (swelling). Both experts acknowledge and agree that physical symptoms appear to be at least possible in a small subset of the population. The definition of accidental contamination does not require that physical symptoms "may likely result" in most people, but only "any person." For that reason, both experts' acknowledgment that rare subjects or sensitive people have experienced some physical symptoms as a result of exposure to MSG is sufficient support to show that physical symptoms of sickness or illness "may likely occur" in any person, which satisfies the policy's definition of an accidental product contamination.

### 2. Ambiguity

In the alternative, the court finds that the "may likely" language is ambiguous as it pertains to the possibility or probability that a member of the

---

[8] Dr. Saxon notes one study, in particular, where two people were exposed to 100 to 250 mg of MSG and exhibited symptoms of hives or swelling. Thus, Dr. Saxon agreed with the conclusion that " 'there does appear to be some evidence to suggest that MSG may be a rare cause of urticaria and possibly angio-edema.' " Docket 30-1 at 7.

public would experience physical symptoms of illness or sickness when ingesting Hot Stuff's sandwich because the language is open to two different interpretations. Whether an ambiguity exists in a contract interpretation inquiry is a question of law to be resolved by the court. *See* 10B Wright & Miller, *Federal Practice and Procedure* § 2730.1 at 60 (3d ed. 1998) ("[A]lthough an inquiry into the contracting parties' intentions may present a question of fact, the preliminary question of whether an ambiguity exists [in the contract] is a question of law that may be resolved summarily by the court."). "Where the provisions of an insurance policy are fairly susceptible of different interpretations, the interpretation most favorable to the insured should be adopted." *Hoglund v. Dakota Fire Ins. Co.*, 742 N.W.2d 853, 859 (S.D. 2007) (citations omitted).

The court finds that the "may likely" language at issue in this case is ambiguous. The word "may" means there is a possibility or a slight chance and the word "likely" means a probability or more than a slight chance. These seemingly conflicting words cannot be read in harmony. The court is left with a question as to the proper amount of probability mandated by the policy that a person will experience physical symptoms of sickness as a result of ingesting MSG-filled sandwiches, which makes the policy ambiguous. In this case, because HCC drafted the insurance policy, any ambiguity is resolved in favor of the insured, Hot Stuff. *See Opperman*, 566 N.W.2d at 489 (stating that when an

18

insurance contract can be interpreted in two different ways "the interpretation most favorable to the insured should be adopted.") (citations omitted).

The more favorable reading of the "may likely" language is that coverage is triggered if there is a possibility that any person may experience physical symptoms of illness or sickness from exposure to MSG. *See Roden v. Gen. Cas. Co. of Wis.*, 671 N.W.2d 622, 626 (S.D. 2003) (finding that the term "occupying" was subject to different interpretations; therefore, the interpretation most favorable to the insured must be adopted). As previously stated, Hot Stuff has brought forth sufficient scientific evidence to show that MSG could cause physical symptoms of illness or sickness in at least one person who is exposed to the mislabeled sandwich. HCC's expert has also admitted that hives or swelling may occur in rare persons who are exposed to the level of MSG at issue in this case. This evidence is sufficient to meet the more favorable definition of "accidental product contamination," and Hot Stuff is entitled to coverage under the policy.

HCC argues[9] that because Hot Stuff voluntarily classified its recall as a Class III recall, it admitted that it knew the sausage breakfast sandwich was not a threat to the health of the public. A Class III recall as described by the FDA is one "where the use of the product will not cause adverse health consequences." Docket 28 ¶ 21. HCC notes that a typical example of a Class III recall is when there is excess water in meat or poultry products. Docket 27 at 6. Hot Stuff's voluntary classification of the type of recall has no bearing on the court's interpretation of the plain meaning of the contract. First, the HCC policy is not triggered by a recall or classification of a recall, but instead by whether a product has been contaminated under the terms of the policy. Additionally, Hot Stuff was working within a short window of time to begin the recall and get the mislabeled product off the market to protect the public and prevent a violation of federal law. That conduct will not be held against the insured as an admission.

---

[9] The parties disagree as to whether the definition at issue was a trigger of coverage or a limit upon coverage. Hot Stuff said that the definition was a limitation on coverage and should be clear and explicit in the policy language. HCC claimed that the language determines what triggers coverage and does not need to be set forth clearly and explicitly. "Limits to coverage, whether in exclusions, limitations, riders, or endorsements, should be set forth clearly and explicitly." *Mid-Century Ins. Co. v. Lyon*, 562 N.W.2d 888, 891 n.4 (S.D. 1997). Because the definition at issue outlines what an "accidental product contamination" is, it specifies what triggers coverage, not when coverage is excluded. Because the court already found that coverage was triggered under the policy, this argument has no impact on the result of the claim.

HCC also argues that like a similar case under a similar accidental product contamination policy, the policy language is unambiguous and the insured must show that there is a likelihood that the contaminant within the recalled product is dangerous. Docket 34 at 12 (citing *Little Lady Foods, Inc. v. Houston Cas. Co.*, 819 F. Supp. 2d 759 (N.D. Ill. 2011)). The court finds, however, that *Little Lady* does not apply to this case because although that plaintiff thought its product was tainted, it actually tested negative for harmful salmonella contaminants. *Little Lady*, 819 F. Supp. 2d at 763. In that case the court said:

> The parties engage in a great deal of debate over whether the phrase "may likely result" means that harm to consumers must be "probable" or merely "possible." But that debate misses the point, because harm to consumers was neither probable nor possible in this situation.

*Id.* at 763. The *Little Lady* court did not analyze what "may likely result" actually meant because the product tested negative for contaminants. *Id.* This case does not support HCC's position on the contractual language at issue.

Because there are no material issues of fact in dispute, the court interpreted the "accidental product contamination" definition within the policy to determine that the contamination incident is a covered incident under the policy. *See* 10B Wright & Miller, *Federal Practice and Procedure* § 2730.1 at 90 (3d ed. 1998) ("[T]he construction of certain provisions in an insurance policy that does not require an inquiry into the parties' intentions or the

consideration of outside and conflicting evidence properly may be resolved by summary judgment.").

**B.    Breach of Contract**

HCC claims that because Hot Stuff cannot show that there is coverage for the claim at issue, there is no breach of the insurance contract by disclaiming coverage. Docket 27 at 15. Under South Dakota law, a breach of contract occurs when there is: "(1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages." *Guthmiller v. Deloitte & Touche, L.L.P.*, 699 N.W.2d 493, 498 (S.D. 2005) (citations omitted).

The parties do not dispute the fact that the accidental product contamination policy was an enforceable promise. There is no dispute that the policy premium of $88,867 has been paid. Docket 1 ¶ 10; Docket 14 ¶ 10. HCC admits that Hot Stuff was eligible for coverage under the policy for the time period of October 1, 2010, to October 1, 2011, but denied that this incident was "covered." Docket 14 at 4. Neither party has argued that the policy was unenforceable in any way other than that the contamination incident at issue here did not trigger coverage under the terms of the policy. And the court through its earlier interpretation of the policy has already established that the contamination incident did trigger coverage under the language of the policy; therefore, HCC breached the enforceable promise when it denied payment on the policy. Thus, Hot Stuff is entitled to partial summary judgment on this claim.

22

## CONCLUSION

The plain meaning of the definition of accidental product contamination encompasses the contamination incident in this case because Hot Stuff's products could have caused physical symptoms of sickness or illness to any person. For that reason, coverage is triggered under the policy, and Hot Stuff is entitled to indemnification for the losses it sustained. Alternatively, the court finds that the contract language "may likely" is an ambiguous phrase, and the interpretation of that phrase is resolved in favor of the insured because HCC drafted the policy. Hot Stuff is entitled to partial summary judgment on its claims regarding the issue of liability. Because there are questions of fact regarding the amount of damages, the damages issue will be submitted to a jury for determination.  Accordingly, it is

ORDERED that plaintiff's motion for partial summary judgment on the issue of contract interpretation (Docket 22) and liability for breach of contract is granted. A jury trial will be scheduled on the issue of damages on the breach of contract claim.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Docket 26) is denied.

Dated July 5, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

23