UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| HOT STUFF FOODS, LLC, | ) | CIV. 11-4055-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| HOUSTON CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Hot Stuff Foods, LLC, brought an action against its insurer, Houston
Casualty Company, seeking indemnification for losses Hot Stuff sustained
due to a product recall. This court found that the insurance contract the
parties entered into covered the losses incurred from the recall and, therefore,
found in favor of Hot Stuff on the issue of liability. *Hot Stuff Foods, LLC v.
Houston Cas. Co.*, Civ. No. 11-4055, 2012 WL 2675225 (D.S.D. July 5, 2012).
The case proceeded to a jury trial on the issue of damages. The jury awarded
Hot Stuff $755,268.07 for recall expense and crisis response/consultant
expenses and $200,000 for lost gross profit. Docket 97.

HCC moves for a judgment as a matter of law on the issue of lost gross
profit, arguing there was no legally sufficient basis for the jury to find Hot
Stuff was entitled to lost profits. Hot Stuff resists the motion and separately
moves for attorneys' fees under SDCL 58-12-3, claiming HCC's refusal to pay
under the insurance policy was vexatious or without reasonable cause. For

the following reasons, HCC's motion for judgment as a matter of law is denied and Hot Stuff's motion for attorneys' fees is also denied.

## BACKGROUND

The underlying facts of this lawsuit were laid out in detail in this court's previous summary judgment order. *Hot Stuff Foods, LLC v. Houston Cas. Co.*, Civ. No. 11-4055, 2012 WL 2675225 (D.S.D. July 5, 2012); Docket 43. In that order, this court found HCC is required to indemnify Hot Stuff for losses Hot Stuff incurred due to a product recall. A jury trial was held to determine the amount HCC was required to indemnify Hot Stuff.

During the trial, Hot Stuff alleged it was entitled to damages under two separate provisions in the insurance policy. First, Hot Stuff claimed it was entitled to $755,268.07 for recall expenses and crisis response/consultant expenses ("recall expenses"). Second, Hot Stuff claimed it was entitled to $933,227.24 for lost profits.

The jury trial lasted four days. During the trial, Hot Stuff called five witnesses and introduced multiple exhibits. HCC called three witnesses[1] and introduced multiple exhibits.

The witnesses that Hot Stuff called who are relevant to this order are Steve Watkins, Jeff Seccombe, and Jason Gaddes. Watkins is the president of Hot Stuff. He received a degree in business and accounting and passed the

---

[1] One of HCC's witnesses, Jubin Merati, Ph.D., is a forensic economist and testified as an expert witness on the issue of lost profits.

2

Certified Public Accountant exam. He has worked at Hot Stuff, or at one of Hot Stuff's parent/affiliate companies, for nearly 27 years. He served in various roles over those 27 years, including acting as a sales representative, financial manager, director, secretary and treasurer, managing director, and chief financial officer. At the time of trial, Watkins had served as president of the company for over a year.

Seccombe is a central regional sales manager for Hot Stuff.[2] He has worked at Hot Stuff for about eight years. As the central regional sales manager, he manages seventeen states and is involved in Hot Stuff's military business. Gaddes is also a member of Hot Stuff's sales force. His territory includes twelve states. He also manages a vending distributor that has twenty-two divisions nationally. He has worked at Hot Stuff for over eight years.

At the conclusion of the trial, the jury returned a verdict which found Hot Stuff was entitled to $755,268.07 for recall expenses and $200,000 for lost profits. The award of $200,000 for lost profits forms the basis for HCC's motion for judgment as a matter of law.

---

[2] There are three members of Hot Stuff's sales force not including Watkins.

## I.     JUDGMENT AS A MATTER OF LAW

### A.     Standard of Review

Under Federal Rule of Civil Procedure 50, a party can move for judgment as a matter of law if the party against whom relief is sought has been fully heard on that issue. Fed. R. Civ. P. 50(a)(1). If the court does not grant the motion, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). In deciding a renewed motion for judgment as a matter of law, the court may enter a judgment on the jury's verdict, order a new trial, or enter judgment on the motion. *Id.*

"When federal jurisdiction is premised on diversity of citizenship, a federal district court applies the sufficiency standards of the state in which it sits." *In re Levaquin Prods. Liab. Litig.*, 700 F.3d 1161, 1165 (8th Cir. 2012). Thus, South Dakota's sufficiency standards apply for purposes of HCC's motion. Under South Dakota law,

> the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in [its] favor. If sufficient evidence exists so that reasonable minds could differ, [judgment as a matter of law] is not appropriate.

*Roth v. Farner-Bocken Co.*, 667 N.W.2d 651, 658-59 (S.D. 2003); *see also* SDCL 15-6-50(a). Furthermore, in a diversity case, the court applies the substantive law of the forum state, which here is South Dakota, to determine

if the standard was satisfied. *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984 (8th Cir. 2008).

A jury verdict should not be set aside "unless there is a complete absence of probative facts to support the verdict." *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003) (internal citation omitted). But "when the record contains no proof beyond speculation to support the verdict, then judgment as a matter of law is appropriate." *Hinz*, 538 F.3d at 984.

### B.    Lost Profits Discussion

HCC argues that there was no legally sufficient evidentiary basis for the jury to find Hot Stuff was entitled to $200,000 in lost profits. HCC is not arguing that Hot Stuff cannot recover lost profits under the insurance contract; rather, HCC argues the evidence Hot Stuff put forth cannot support a $200,000 award.

The South Dakota Supreme Court has articulated some general principles regarding lost profits.[3] As with any type of damages, damages for lost profits "must not be speculative, contingent, or uncertain and there must be reasonable proof of the amount thereof." *Olson v. Aldren*, 170 N.W.2d 891,

---

[3] These cases, however, are different from the situation here because they did not involve an insurance contract that explicitly provided for lost profits coverage. The Supreme Court faced the questions of: (1) whether lost profits damages were recoverable generally, and (2) if so, what was the amount of the damages. Here, damages for lost profits are recoverable under the terms of the insurance policy, and the only issue is how much, if any, should be awarded for lost profits.

895 (S.D. 1969); *see also Lamar Adver. of S.D., Inc. v. Heavy Constructors, Inc.*, 745 N.W.2d 371, 380 (S.D. 2008) (stating that courts should consider the circumstances in which damages occur and determine whether a claim for damages is "remote, speculative, or uncertain"). As far as calculating the amount of lost profits, "[a]ny reasonable method of estimating a prospective profit is acceptable. Absolute certainty is not required." *Olson*, 170 N.W.2d 895 (internal citation omitted); *see also Hepper v. Triple U Enter., Inc.*, 388 N.W.2d 525, 529 (S.D. 1986) ("Mathematical precision is not required but loss must be shown in a manner reasonable under the circumstances.").

Under the circumstances here, there is no doubt that lost profits are recoverable under the insurance policy. The insurance contract provides:

> [HCC] agrees to indemnify [Hot Stuff] for LOSS resulting directly from an ACCIDENTAL PRODUCT CONTAMINATION . . . . LOSS shall mean . . . [l]oss of GROSS PROFIT, incurred as a result of an ascertainable reduction in sales revenue caused solely and directly by an ACCIDENTAL PRODUCT CONTAMINATION for the period:
>
> > (1)   of twelve months following discovery of the ACCIDENTAL PRODUCT CONTAMINATION or
> >
> > (2)   during which [Hot Stuff's] sales revenue for [Hot Stuff's] PRODUCT(S) remain less than the level that could have been reasonably projected had the ACCIDENTAL PRODUCT CONTAMINATION not occurred
>
> whichever shall be the period first to expire.
>
> GROSS PROFIT shall mean the difference between:

6

a)      the revenue that could have been reasonably
projected, but which has been lost solely and directly
as a result of an ACCIDENTAL PRODUCT
CONTAMINATION, and

b)      the variable cost that would have been incurred, but
which have been saved as a result of not making
these sales (including the cost of raw materials, and
all other saved costs).

Docket 28-1 at 4-5, 14. The court found in an earlier order that an accidental

product contamination occurred when Hot Stuff mislabeled its products,

thereby triggering the abovementioned indemnification provision. *Hot Stuff*

*Foods, LLC v. Houston Cas. Co.*, Civ. No. 11-4055, 2012 WL 2675225 (D.S.D.

July 5, 2012). The issue then comes down to whether Hot Stuff introduced

sufficient evidence at trial so that a reasonable computation of the amount of

lost profits, if any, was possible.

Hot Stuff sought $199,604.02 for lost profits attributed to recall

products and $733,623.22 for lost profits attributed to new products for a

total lost profits claim of $933,227.24. In calculating its losses for recall

products, Hot Stuff compared its 2010 profits from recall products with its

2011 profits from recall products. Before comparing its 2010 profits, however,

Hot Stuff adjusted the 2010 profits for customers who were first-time buyers

of a particular product, referred to by Hot Stuff as a "time-adjustment." The

adjustment was meant to illustrate the estimated profits resulting from what

customers supposedly would have purchased in 2010 had they begun

7

purchasing the product in January 2010 or before. The time-adjustment works by finding the average monthly volume that was purchased by the customer for the months following the first-time purchase and multiplying that average by twelve to project what the full year total would have been had the customer been purchasing the product from the beginning of 2010. For example, if a customer purchased 600 units of Product X in 2010 but did not begin purchasing Product X until July 2010, the customer's time-adjusted total would be 1,200 units.[4] Hot Stuff then determined what its margin, or profits, would have been in 2010 using 1,200 units instead of 600 units.

To calculate the total amount of lost profits for recall products, Hot Stuff only considered the customers who purchased fewer recall products in 2011 than they did in 2010, taking into account the time-adjustment.[5] Hot Stuff also excluded from its calculation customers it knew were not ongoing customers. A summation of the lost profits from those customers who had a decrease when comparing 2010 time-adjusted numbers to 2011 numbers amounted to $199,604.02—the amount Hot Stuff sought for lost profits attributed to recall products.

---

[4] The average monthly volume is the total units sold (600) divided by the number of months during which the customer was considered to be a purchaser of that product (6). The full year time-adjusted total then is found by multiplying the average monthly volume by the total months in the year (12).

[5] Hot Stuff's lost profits damages calculation for recall products does not take into account any customers who generated more 2011 profits than the 2010 time-adjusted profits.

Hot Stuff also asked the jury to award lost profits damages for new products that were first introduced in 2011. Hot Stuff's theory for these damages was that the recall caused the company to fall behind in getting its new products ready to market at trade shows and in being able to meet timelines for certain customers. To generate a specific damages number, Hot Stuff compared its 2011 profits with its projected 2011 profits as set out in its "plan."

Hot Stuff creates a plan at the end of each year to project profits for the upcoming year. Watkins and members of the sales team project profits by estimating the type and amount of product each customer will purchase each month. These numbers are generated, in part, by discussions with customers,[6] distributors, and brokers. Once Watkins and the sales team finish creating the plan, the plan is then examined by a group of analysts to assess the reasonableness of the plan. Ultimately, the board must approve the plan.[7]

In calculating its lost profits for new products, Hot Stuff compared its actual 2011 profits from new products with the profits it had projected in its

---

[6] During his testimony, Watkins stressed the importance of talking to individual customers to get a better estimate of what the customer intended to purchase during the upcoming year.

[7] Prior to 2010, Watkins was the only person charged with developing the plan. Hot Stuff added more parties and additional information to the process in hopes that it would make the plan more accurate.

9

2011 plan. The difference between the two was $733,623.22, which is the total amount Hot Stuff asked the jury to award for lost profits for new products.

HCC attacks Hot Stuff's lost profits evidence in three ways. First, HCC objects to Watkins's qualifications and his ability to testify regarding lost profits. Second, HCC takes issue with Hot Stuff's calculation of its lost profits in relation to the recall products. And third, HCC disputes Hot Stuff's calculation of lost profits in relation to the new products.

### 1.    Watkins's Testimony

The court first addresses Watkins's ability and qualifications to testify about lost profits. This court addressed the issue of whether a president of a company can testify on the issue of lost profits in *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 328 F. Supp. 2d 1029, 1039-40 (D.S.D. 2003). After noting the president's education and extensive experience at the company, this court found that, under South Dakota law, he "clearly was qualified" to testify about the company's lost profits. *Id.* at 1039. The Eighth Circuit Court of Appeals affirmed this court's finding, stating that a "business owner's testimony is sufficient to support an award of lost profits." *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 837 (8th Cir. 2005) (citing *Pullman v. Land O'Lakes, Inc.*, 262 F.3d 759, 765 (8th Cir. 2001) and *Olson v. Aldren*, 170 N.W.2d 891, 895 (S.D. 1969)). The Eighth Circuit specifically held that

10

the president/owner's experience in the business provided the foundation to testify to "his estimate on DMI's growth rate, a ten-year projection on lost profits (based on DMI's history of having at least ten-year relationships with other manufacturers), a 25% 'Other Equipment' estimate . . . , and an estimate of the amount DMI would realize from the sale of parts and service." *Id.* at 837.

Here, Watkins received a degree in business and accounting and passed the Certified Public Accountant exam. He has worked at Hot Stuff, or at a parent/affiliate company, for nearly 27 years. He served in various roles over those 27 years, including acting as a sales representative, financial manager, director, secretary and treasurer, managing director, and chief financial officer. Watkins has served as president of the company for over a year. Because of his education and extensive experience at Hot Stuff, Watkins's testimony had proper foundation and was sufficient to support an award of lost profits. His specific testimony on the issue of lost profits went no further than the type of testimony that the Eighth Circuit permitted from the owner/president in *Diesel Machinery*. *Id.*

### 2.   Lost Profits from Recall Products

Next, the court examines the issue of lost profits relating to the recall products. HCC's first contention deals with Hot Stuff's methodology in calculating its lost profits. First, HCC argues that because Hot Stuff had an

11

overall increase in profits from its recall products in 2011 when compared to its 2010 profits, it cannot have a claim for lost profits. Second, HCC argues Hot Stuff cannot recover lost profits because its 2011 actual profits from recall products exceeded its projected profits from recall products, as set out in its 2011 plan. Both of these arguments put forth the same proposition: Because Hot Stuff had a strong year in 2011, it should not be able to recover lost profits. And third, HCC argues Hot Stuff's calculation using its time-adjustment is not reasonable.

The insurance contract explicitly provides the method for calculating lost profits. The contract requires HCC to indemnify Hot Stuff for a loss of gross profit—which is the difference between (1) the revenue that could have reasonably been projected, but which was lost solely and directly as a result of the recall, and (2) the variable costs that would have been incurred, but which have been saved as a result of not making the sales—incurred as a result of an ascertainable reduction in sales revenue caused solely and directly by the recall. Docket 28-1 at 4-5, 14. The provisions in the insurance contract do not deny Hot Stuff lost profits if it exceeds either its 2010 profits or its projected 2011 profits. Under the contract, Hot Stuff was only required to make a reasonable projection of what its profits would have been had the recall not occurred. Hot Stuff is entitled to indemnification for such losses so long as they were caused solely and directly by the recall.

In making its projection of lost profits from the recall products, Hot Stuff looked at customer sales from 2010 and made the time-adjustment for ongoing customers who purchased a recall product for the first time in 2010. When comparing these projected profits to its actual 2011 profits, there was an ascertainable reduction. Whether Hot Stuff's projection was reasonable is a question of fact for the jury. *See, e.g., FB & I Bldg. Prods, Inc. v. Superior Truss & Components, a Div. of Banks Lumber, Inc.*, 727 N.W.2d 474, 480 (S.D. 2007) ("Whether damages have been proven with reasonable certainty is a question of fact."); *Von Sternberg v. Caffee*, 692 N.W.2d 549, 555 (S.D. 2005) ("Whether the fact of a loss has been proven to a reasonable certainty is ordinarily a question for the trier of fact."); *Lord v. Hy-Vee Food Stores*, 720 N.W.2d 443, 454-55 (S.D. 2006) ("An award of damages is a factual issue to be determined by the jury. . . . [T]he difficulty in computing damages should not be confused with the requirement of proving damages[.]") (internal citations omitted). HCC thoroughly cross-examined Watkins regarding the reasonableness of his projection and also put on an expert of its own to address the issue of reasonableness. The jury heard this evidence and performed its role as the fact finder.[8] When considering Watkins's

---

[8] The court instructed the jury that Hot Stuff had the burden to prove by the greater convincing force of the evidence the amount of lost profits and that the verdict must be based on evidence and not upon speculation, guesswork, or conjecture. Docket 94 at 6.

13

methodology, the court cannot say his projection was unreasonable as a matter of law so as to take this fact issue out of the hands of the jury.

HCC also takes issue with the evidence Hot Stuff put forth to show the recall was the cause of its alleged lost profits for the recall products. The insurance contract provides that the lost profits must be caused "solely and directly" by the recall.

Hot Stuff's methodology in computing its lost profits for recall products goes to the issue of causation. Hot Stuff limited its computation to only the recall products and to only those customers who purchased fewer recall products than they did in 2010, after applying the time adjustment to certain customers. Hot Stuff could have attempted to claim lost profits for customers who actually purchased more recall products in 2011. Limiting its alleged lost profits for recall products to customers who purchased less assists in showing causality.

Hot Stuff also introduced evidence that its business was thriving at the end of 2010 (with the expectation of continued growth in 2011) and that the industry in general did significantly better in 2011 (up 10.1 percent when compared to 2010). Watkins testified that the reduced profits for the recall products were caused by the recall. Seccombe testified that customers suspended ordering because of the recall. Docket 116-2 at 11-13. Seccombe also testified that Hot Stuff was unable to place orders at trade shows for

recall products because Hot Stuff did not have product in the pipeline to meet the orders, which was an effect of the recall. Docket 116-2 at 18-19. Gaddes testified that the recall disrupted getting products out in 2011 and that Hot Stuff lost a lot of business because of the recall. In all, Hot Stuff introduced sufficient evidence at trial for the jury to determine that the recall caused, at least some, lost profits with respect to the recall products. *See, e.g., Maryott v. First Nat'l Bank of Eden*, 624 N.W.2d 96, 101 (S.D. 2001) (noting that whether an act was the cause of damages is a question of fact for the jury). Therefore, the court finds Hot Stuff introduced legally sufficient evidence for the jury to determine Hot Stuff was entitled to lost profits from recall products under the terms of the insurance policy.

### 3.      Lost Profits from New Products

HCC also argues Hot Stuff did not put forth sufficient evidence to establish lost profits with respect to new products. HCC takes issue with the methodology Hot Stuff employed in claiming $733,623 for losses and again contends Hot Stuff failed to establish causation.

The language in the contract controls what was required of Hot Stuff. The contract requires Hot Stuff to make a reasonable projection of what it could have profited had the recall not occurred. Hot Stuff is entitled to indemnification for such losses so long as they were caused solely and directly by the recall.

For losses associated with new products, Hot Stuff compared its 2011 actual profits with its projected 2011 profits from its plan. Much like the case for recall products, whether Hot Stuff's projection of 2011 profits in its plan was reasonable is a question of fact for the jury.

Hot Stuff put forth sufficient evidence to show its projections made in the 2011 plan were in fact reasonable. Watkins testified about the intricacies involved in creating the plan. Several Hot Stuff employees were involved in the process. Discussions took place with customers, distributors, and brokers to ensure the accuracy of the projections. The plan was also examined by a group of outside analysts.

HCC specifically claims that because they were "new" products, Hot Stuff's projections of its profits from the new products are inherently speculative and unreasonable. In addition to the evidence presented above, Watkins testified that although the new products were called "new," they were actually just permutations (e.g., a change in size) of older products that had sales histories. The new products were created after lengthy discussions with customers about their needs. Because the new products were, in most cases, minor changes to older products and were created after discussions with customers, Hot Stuff's projections of its profits from the new products were not, as a matter of law, overly optimistic, unreasonable aspirations. There was a reasonable basis using the older products by which Hot Stuff made its

projections. Therefore, Hot Stuff put forth sufficient evidence to have the jury decide this issue of fact.

Turning again to the issue of causation, the contract required Hot Stuff to show the lost profits relating to new products were solely and directly caused by the recall. Hot Stuff's main causation theory for the new products was that the recall caused the company to fall behind in getting its new products ready to market at trade shows and that the company was unable to meet timelines for certain customers. Watkins, Seccombe, and Gaddes all testified to the same. HCC contested this causation theory through vigorous cross-examination of these witnesses. In the end, it was an issue for the jury to decide.

In sum, the majority of HCC's criticisms go to either the weight given to Hot Stuff's evidence or the credibility given to Hot Stuff's witnesses. These are issues exclusively for the fact-finder. Here, the jury's lost profits verdict of $200,000—when Hot Stuff asked for just under $1 million—suggests that the jury carefully considered the evidence, read the court's instructions, and found that $200,000 of lost profits were caused solely and directly by the recall. There is no reason for the court to now second-guess the jury's findings of fact and disrupt the jury's verdict. HCC's motion for a judgment as a matter of law is therefore denied.

17

## II.     ATTORNEYS' FEES

Hot Stuff moves for attorneys' fees in the amount of $333,768.70 pursuant to SDCL 58-12-3. SDCL 58-12-3 allows an insured to recover attorneys' fees "if it appears from the evidence that [the insurer] has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause[.]" The objective of this statute "is to discourage contesting insurance coverage and to reimburse an insured for any reasonable attorney's fees necessarily incurred in defending or enforcing a valid insurance contract right." *Tripp v. W. Nat'l Mut. Ins. Co.*, 664 F.3d 1200, 1205 (8th Cir. 2011).

Hot Stuff only seeks attorneys' fees for the time period and conduct of HCC following this court's summary judgment order (Docket 43) in which the court found the recall was covered by the insurance policy. Hot Stuff argues that because HCC's attorney recommended to the jury during closing argument that it award $417,758.06 for recall expenses, HCC should have provided that sum to Hot Stuff immediately after this court's summary judgment order. By not doing so, Hot Stuff claims HCC's conduct was vexatious and without reasonable cause.

As an initial matter, it is important to note that HCC has not conceded the issue of liability, i.e., whether the recall is covered by the insurance policy. Thus, HCC's position is, and always has been, that Hot Stuff is not

18

entitled to any damages because HCC is not required to indemnify it under the contract.

Additionally, the total amount of Hot Stuff's claim has been hotly contested throughout this litigation. Hot Stuff has not directed the court to any evidence on the record that shows there was ever some mutually-agreed upon sum to which Hot Stuff was entitled.[9] Instead, the record shows (as was evident during the trial) that the amount of damages, both for recall expenses and for lost profits, was always in dispute. *E.g.*, Docket 43 at 23 ("Because there are questions of fact regarding the amount of damages, the damages issue will be submitted to a jury for determination."). Indeed, the jury only considered the issue of damages. The trial lasted four days, three of which were dedicated to introducing evidence on the sole issue of the amount of damages owed under the insurance policy. The issue of lost profits, which the court addressed in detail above, was especially contested: Hot Stuff requested $933,227.24 and HCC claimed Hot Stuff was not entitled to any lost profits. The jury ultimately concluded that $200,000 in lost profits was the proper amount under the policy. Based on these facts and on the evidence presented at trial, the court finds HCC had "a bona fide and reasonable factual ground

---

[9] The comment by HCC's attorney made during closing argument is not evidence. *Bierle v. Liberty Mut. Ins. Co.*, 992 F.2d 873, 878 (8th Cir. 1993) ("Closing arguments are not evidence[.]"). Rather, the comment was a strategic decision made by the attorney at the conclusion of the trial after hearing all of the evidence.

for contesting" the amount of damages. *Howie v. Pennington Cnty.*, 563 N.W.2d 116, 119 (S.D. 1997).

Even assuming HCC valued Hot Stuff's claim at $417,758.06 immediately following this court's summary judgment order, HCC's conduct following that order was still not vexatious or without reasonable cause. Hot Stuff sought an additional $1.5 million in damages over and above the $417,758.06 HCC's counsel suggested during closing argument. It is likely that the same amount of discovery, number of motions, and extent of a trial would have taken place anyway, especially when considering the contentious nature of the lost profits claims. In other words, Hot Stuff's attorneys' fees were more than likely unavoidable, and the fees were not incurred because of any vexatious or unreasonable conduct on the part of HCC.[10] Therefore, Hot Stuff is not entitled to an award of attorneys' fees under SDCL 58-12-3.

## CONCLUSION

Hot Stuff put forth legally sufficient evidence during trial to submit the issue of lost profits to the jury and to uphold the jury's verdict of $200,000 for lost profits. Separately, HCC's conduct in litigating the issue of the amount of damages was reasonable and not vexatious. Accordingly, it is

---

[10] Because the court finds that HCC's conduct was not vexatious or unreasonable, the court does not need to address the issue of whether Hot Stuff can amend its complaint.

ORDERED that HCC's renewed motion for judgment as a matter of law (Docket 113) is denied.

IT IS FURTHER ORDERED that Hot Stuff's motion for attorneys' fees (Docket 106) is denied.

IT IS FURTHER ORDERED that Hot Stuff's motion to amend its complaint (Docket 77) is denied as moot.

Dated January 2, 2014.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

21